IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 17-cv-02696-PAB-NYW

LESLIE WEISE,

     Plaintiff,

v.

COLORADO SPRINGS, COLORADO, a municipality,
ANDRES PICO, in his official and individual capacity,
BILL MURRAY, in his official and individual capacity,
AMY TRINIDAD, in her individual capacity,
WYNETTA MASSEY, in her official and individual capacity,
TOM STRAND, in his official and individual capacity,
HELEN COLLINS, in her official and individual capacity,
KEITH KING, in his official and individual capacity,
JILL GAEBLER, in her official and individual capacity,
LARRY BAGLEY, in his official and individual capacity,
DON KNIGHT, in his official and individual capacity, and
MERV BENNETT, in his official and individual capacity,

     Defendants.

_____

**ORDER**
_____

     This matter is before the Court on defendants' Motion to Dismiss [Docket No.

49]. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## I. BACKGROUND[1]

     In August 2015, plaintiff submitted a Colorado Open Records Act ("CORA")

request for any air quality studies conducted and/or commissioned by Colorado Springs

Utilities regarding emissions from the Martin Drake Power Plant. Docket No. 41 at 7,

_____

[1]The facts stated below are drawn from plaintiff's second amended complaint,
Docket No. 41, and are presumed to be true for purposes of this motion to dismiss.

¶ 27. After Colorado Springs refused to release the records, citing the attorney-client and work product privileges, plaintiff filed suit in the District Court for El Paso County, Colorado. *Id.*, ¶ 28. The District Court ruled in favor of Colorado Springs on May 5, 2016, and on June 22, 2016, plaintiff appealed the decision to the Colorado Court of Appeals. *Id.* at 7-8, ¶¶ 29, 31.

At some point thereafter, the Clerk's Office for the Colorado Court of Appeals mailed the parties an electronic copy of the trial court record. *Id.* at 8, ¶ 32. While reviewing the record in November 2016, plaintiff discovered an Air Quality Study that she had been seeking in the CORA proceedings. *Id.*, ¶ 33. Over the next few days, plaintiff filed several motions in the Colorado Court of Appeals requesting guidance about the disclosure of the Air Quality Study and seeking the study's immediate release. *Id.* at 8-9, ¶ 36. On November 16, 2016, the Colorado Court of Appeals entered an order clarifying that the Air Quality Study had been disclosed as the result of a clerical error and instructing the parties that they were not to distribute, download, retain, or disseminate the sealed material. *Id.* at 9, ¶ 37. Plaintiff then confirmed with the court that the court's order did not prevent her from sharing her publicly filed motions or speaking about the contents of the documents that had inadvertently been disclosed to her. *Id.*, ¶ 38.

Plaintiff shared two of her motions with the Colorado Springs Gazette and others via email. *Id.*, ¶ 39. The motions contained statements that (1) records affecting public health and safety had "been improperly withheld"; (2) Colorado Springs Utilities had told the public that it was in compliance with sulfur dioxide regulations and standards,

despite being obligated to report any air quality violations to the Environmental Protection Agency; and (3) withholding the Air Quality Study was "an egregious abuse of the CORA . . . laws." *Id.* at 9-10, ¶ 39.

On November 21, 2016, the Colorado Springs Gazette published a story about the Air Quality Study. *Id.* at 10, ¶ 40. Although the article did not quote from the Air Quality Study, it reported plaintiff's conclusion that "sulfur-dioxide emissions from the coal-fired Martin Drake Power Plant violated federal standards contrary to filings by Colorado Springs Utilities." *Id.* The article also quoted Amy Trinidad, the spokesperson for Colorado Springs Utilities, who disputed plaintiff's characterization of the Air Quality Study. *Id.*

On November 22, 2016, Colorado Springs filed a "Cross Motion for Order to Show Cause" requesting that plaintiff be held in contempt for violating the Colorado Court of Appeals' November 16, 2016 order. *Id.* at 10-11, ¶ 42. The court dismissed the motion with prejudice on February 8, 2017, *id.* at 11, ¶ 46, and never made a finding that plaintiff had violated a law or court order. *Id.*, ¶ 47.

In November and December 2016, various Colorado Springs officials made public statements concerning plaintiff's characterization of the Air Quality Study. For example, in an email dated November 30, 2016, city council member and Colorado Springs Utilities Board Chair Andres Pico told a constituent that plaintiff's statements about the Air Quality Study were "not true." *Id.* at 12, ¶ 49. In another email dated December 5, 2016, Mr. Pico informed a different Colorado Springs resident, "The information in the article is not accurate nor are [Ms. Weise's] allegations being stated

at all true. The allegation [from Ms. Weise] is that the study proves past violations of air quality standards. That allegation is absolutely false." *Id.,* ¶ 50. Mr. Pico made similar statements in an email exchange on December 16, 2016, telling a Colorado Springs resident that what she had "read in the paper [was] not true." *Id.* at 13, ¶ 51. Finally, during a meeting of the Colorado Springs Utilities Board on December 19, 2016, Mr. Pico stated, "The report that the Drake Power Plant has been in violation is simply not true." *Id., ¶ 52.*

On December 1, 2016, Bill Murray, another Colorado Springs city council and Utilities Board member, told a resident in an email concerning plaintiff, "You know I do not like it. However, what she did she knew was illegal." *Id.* at 14, ¶ 56. At a public forum the next day, Mr. Murray again stated that plaintiff's actions in speaking about the Air Quality Study were illegal. *Id.*, ¶ 57. Colorado Springs Utilities employee Amy Trinidad likewise told a reporter for the Colorado Springs Independent media that "Ms. Weise may have violated [the Colorado Court of Appeals] order when she public [sic] discussed documents sealed by the District Court." *Id.* at 15, ¶ 62.

Plaintiff is licensed to practice law in California, New York, and Pennsylvania. *Id.* at 16, ¶ 70. In March 2017, the Colorado Springs City Council voted to take formal action against plaintiff in all three states. *Id.* at 16-17, ¶ 71. At that time, Tom Strand, Bill Murray, Helen Collins, Keith King, Jill Gaebler, Andres Pico, Larry Bagley, Don Knight, and Merv Bennett were members of the city council. *Id.* at 17, ¶ 71.

In April 2017, Colorado Springs' City Attorney Wynetta Massey filed formal actions against plaintiff with the state bar associations of New York, California, and

Pennsylvania.  *Id.* at 17, ¶¶ 72-75.  The complaints stated that plaintiff had violated one or more court orders and had unlawfully disclosed government records.  *Id.*, ¶ 72.  Plaintiff was forced to obtain counsel in multiple states to defend against the bar complaints, even though all three were ultimately dismissed in her favor.  *Id.* at 19, ¶¶ 85-87.  After the complaints were dismissed, Colorado Springs City Council member Tom Strand stated publicly that plaintiff had engaged in unethical conduct by filing her motion with the Colorado Court of Appeals and making statements regarding the Martin Drake Power Plant.  *Id.*, ¶ 87.

As a result of defendants' conduct, plaintiff has had to take significant time away from her business consulting firm, has suffered damages to her personal and professional reputation, and has lost at least one professional client opportunity.  *Id.* at 20, ¶ 88.

Plaintiff filed this lawsuit on November 13, 2017.  Docket No. 1.  In her operative complaint, plaintiff asserts First Amendment free speech and retaliation claims against Colorado Springs and defendants Massey, Strand, Murray, Collins, King, Gaebler, Pico, Bagley, Knight, and Bennett in their individual and official capacities; a Fourteenth Amendment stigma-plus claim against all defendants; state-law defamation claims against defendants Pico, Murray, Trinidad, and Massey; a state-law claim for intentional infliction of emotional distress against defendants Pico, Murray, Trinidad, and Massey; and a state-law abuse of process claim against defendants Massey, Strand, Murray, Collins, King, Gaebler, Pico, Bagley, Knight, and Bennett.  *See* Docket No. 41 at 20-28.  On June 5, 2018, defendants moved to dismiss plaintiff's second amended complaint

under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), asserting various governmental immunity defenses and failure to state a claim.  Docket No. 49.  Plaintiff filed a response to the motion on July 10, 2018, Docket No. 54, to which defendants replied on August 7, 2018.  Docket No. 58.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted ).

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When resolving a facial attack on the allegations of subject matter jurisdiction, the Court "must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). To the extent the defendant attacks the factual basis for subject matter jurisdiction, the Court "may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *SK Finance SA v. La Plata County*, 126 F.3d 1272, 1275 (10th Cir. 1997). "Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment in such circumstances." *Id.* Ultimately, and in either case, plaintiff has "[t]he burden of establishing subject matter jurisdiction" because she is "the party asserting jurisdiction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

Defendants in this case rely on several documents outside of the pleadings in moving to dismiss plaintiff's claims. *See* Docket Nos. 49-1 to 49-11. Generally, if a court considers matters outside the pleadings in deciding a Rule 12(b)(6) motion, "the

motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P

12(d). However, "if a plaintiff does not incorporate by reference or attach a document to

its complaint, but the document is referred to in the complaint and is central to the

plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to

be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers,*

*Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Here, defendants have submitted (1)

plaintiff's Notice to Court and Request for Guidance, which she filed in the Colorado

Court of Appeals on November 16, 2016 [Docket No. 49-1]; (2) the Colorado Court of

Appeals' November 16, 2016 order stating that the sealed file was not to be

"disseminated" [Docket No. 49-2]; (3) plaintiff's Motion for Immediate Access to Certain

Withheld Records, which she filed with the Colorado Court of Appeals on November 21,

2016 [Docket No. 49-3]; (4) two email exchanges regarding plaintiff's November 21,

2016 motion [Docket No. 49-4]; (5) news articles concerning the inadvertently-disclosed

Air Quality Study [Docket No. 49-5]; (6) the Colorado Court of Appeals December 6,

2016 order finding good cause for the issuance of a contempt citation [Docket NO. 49-

6]; (7) the Colorado Court of Appeals January 6, 2017 contempt advisement [Docket

No. 49-7]; (8) a Stipulated Motion to Dismiss Appeal and Contempt Citation filed by

plaintiff and Colorado Springs on February 3, 2017 in the CORA litigation [Docket No.

49-8]; (9) a December 16, 2016 email exchange between Andres Pico and Jacquie

Ostrom, and meeting minutes for the December 19, 2016 Colorado Springs Utilities

Board meeting [Docket No. 49-9]; (10) a January 5, 2017 blog article regarding

plaintiff's contempt proceedings [Docket No. 49-10]; and (11) a November 17, 2016

order by the Colorado Court of Appeals denying Colorado Springs' motion to modify the

November 16, 2016 order [Docket No. 49-11].  With the exception of Docket Nos. 49-7 and 49-8, all of these exhibits are referenced in and central to plaintiff's complaint.  *See* Docket No. 41 at 8-13, 15, ¶¶ 36-37, 39-40, 44-45, 49-52, 62.  Because plaintiff does not dispute their authenticity, *see* Docket No. 54 at 5-6, the Court will consider the exhibits in resolving defendants' motion to dismiss.

The remaining exhibits, Docket Nos. 49-7 and 49-8, are part of the judicial record in the underlying CORA proceedings.  As matters of public record subject to judicial notice, the orders may be considered for their contents without converting the motion to dismiss into a motion for summary judgment.  *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

## III.  ANALYSIS

### A.  Federal Constitutional Claims

Defendants move to dismiss plaintiff's claims under the First and Fourteenth Amendments on three grounds: (1) defendants are absolutely immune from suit; (2) plaintiff's allegations do not establish a constitutional violation or a claim for municipal liability; and (3) plaintiff's rights were not clearly established at the time of the alleged constitutional violations.  *See* Docket No. 49 at 7, 12, 17, 18.

#### 1.  Absolute Immunity

Defendants argue that they are absolutely immune from liability under the First and Fourteenth Amendments to the extent plaintiff's constitutional claims are premised on defendants' filing of the formal grievances with the offices of attorney regulation and the motion for contempt in the underlying CORA litigation.  *See* Docket No. 49 at 7-10.

Plaintiff responds that the state-created immunities relied on by defendants cannot serve as a bar to her federal constitutional claims under the Supremacy Clause. *See* Docket No. 54 at 6-8. Additionally, she argues that defendants have not cited any authority supporting the extension of federal absolute immunity doctrines to the facts of this case. *See id.* at 9-13.

Defendants bifurcate their immunity argument into two sections. The first addresses their entitlement to immunity for the filing of attorney grievances and appears to rely exclusively on state-created immunity doctrines. *See* Docket No. 49 at 7-8 (arguing that the decision to file formal grievances with the offices of attorney regulation "is protected by an absolute privilege in all four states"). The second section asserts absolute immunity with respect to the filing of the contempt motion and relies on a mix of state and federal cases. *See id.* at 8-10.

Plaintiff correctly argues that state-created immunity doctrines do not operate as a bar to her federal constitutional claims. As the Supreme Court explained in *Martinez v. California*, 444 U.S. 277 (1980),

> Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced. The immunity claim raises a question of federal law.

*Id.* at 284 n.8; *see also Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 375 (1990) ("The elements of, and the defenses to, a federal cause of action are defined by federal law."); *Tieman v. Tul-Center, Inc.*, 18 F.3d 851, 853 (10th Cir. 1994) (holding that the

Oklahoma Governmental Tort Claims Act did not immunize the defendants from liability under 42 U.S.C. § 1983).  Thus, to the extent defendants rely on immunity doctrines created by state statute or common law, those doctrines do not support the dismissal of plaintiff's claims under the First and Fourteenth Amendments.

Some of the cases cited by defendants address absolute immunity doctrines recognized under federal law.  *See, e.g.*, *Valdez v. City & Cty. of Denver*, 878 F.2d 1285 (10th Cir. 1989).  Although defendants do not clearly distinguish among the various federally-recognized forms of absolute immunity, *see Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (discussing federal immunity doctrines), the cases they cite address four types of immunity that are potentially relevant in this case: (1) judicial or quasi-judicial immunity; (2) witness immunity; (3) legislative immunity; and (4) prosecutorial immunity.  *See, e.g.*, *Briscoe v. LaHue*, 460 U.S. 325, 335-46 (1983) (witness immunity); *Butz v. Economou*, 438 U.S. 478, 511-17 (1978) (quasi-judicial and prosecutorial immunity); *Imbler v. Pachtman*, 424 U.S. 409, 420-30 (1976) (prosecutorial immunity); *Stein v. Disciplinary Bd. of Sup. Ct. of N.M.*, 520 F.3d 1183, 1190-91, 1193-95 (10th Cir. 2008) (judicial, quasi-judicial, and prosecutorial immunity); *Valdez*, 878 F.2d at 1287-88 (judicial and quasi-judicial immunity); *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992) (prosecutorial immunity); *Shoultes v. Laidlaw*, 886 F.2d 114, 117-18 (6th Cir. 1989) (legislative, prosecutorial, and judicial immunity).

### a.  Judicial, Quasi-Judicial, and Witness Immunity

Although defendants cite cases involving the assertion of judicial, quasi-judicial, and witness immunity, they have not provided any basis for applying these doctrines in

the context of this lawsuit.  *See Collins v. Daniels*, 916 F.3d 1302, 1315 (10th Cir. 2019)

("The proponent of a claim to absolute immunity bears the burden of establishing the

justification for such immunity."  (quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S.

429, 432 (1993))).  The doctrine of judicial immunity protects government officials

performing judicial functions from liability in damages suits.  *See Diaz v. King*, 687 F.

App'x 709, 711-12 (10th Cir. 2017) (unpublished).  Under quasi-judicial immunity,

government officials are immune from liability for carrying out facially valid court orders.

*See Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009); *Valdez*, 878 F.2d at 1288-90.

 Finally, witness immunity applies to any claim based on a witness's testimony in judicial

proceedings.  *See Rehberg*, 566 U.S. at 367.  Because defendants have not cited any

allegations showing that they were performing judicial functions, executing a court

order, or testifying as a witness in judicial proceedings, these immunity doctrines do not

apply.

### b.  Legislative Immunity

"Absolute legislative immunity attaches to all actions taken in the sphere of

legitimate legislative activity."  *Collins*, 916 F.3d at 1317 (quoting *Bogan v. Scott-Harris*,

523 U.S. 44, 54 (1998)).  The doctrine extends to the legislative activities of local

legislators.  *See Bogan*, 523 U.S. at 49.  "Whether an act is legislative turns on the

nature of the act, rather than on the motive or intent of the official performing it."  *Id.* at

54.

At the outset, the Court notes that defendants do not clearly assert legislative

immunity with respect to the attorney misconduct complaints.  Defendants' only

apparent invocation of the doctrine is a citation to *Shoultes* in the portion of their brief that addresses their entitlement to immunity for the filing of the contempt motion.  *See* Docket No. 49 at 10.  But even that discussion fails to specify which of the various defendants are asserting legislative immunity and for what conduct.

Even construing defendants' argument liberally, the Court finds no basis for applying legislative immunity in this case.  There is no indication from the allegations that Ms. Massey, the city attorney, was acting in a legislative capacity when she filed the contempt motion and the attorney misconduct complaints.  *Compare Bogan*, 523 U.S. at 55 (holding that voting for an ordinance, introducing a budget, and signing an ordinance into law constituted legislative actions because "they were integral steps in the legislative process"); *Shoultes*, 886 F.2d at 118 (extending *prosecutorial* immunity to city attorney for his decision to seek a contempt citation).  And, to the extent *Shoultes* and *Bogan* support a finding that voting for a city ordinance constitutes a "quintessentially legislative" activity, *Bogan*, 523 U.S. at 45; *see also Shoultes*, 886 F.2d at 117, "voting on an issue, in and of itself, [does not] determine that [an] act is legislative in nature."  *Kamplain v. Curry Cty. Bd. of Comm'rs*, 159 F.3d 1248, 1252 (10th Cir. 1998).  Instead, an act is legislative if it "contain[s] matter which is properly . . . regarded as legislative in its character and effect."  *Id.* (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)).

In *Kamplain*, the Tenth Circuit held that a county board of commissioners acted in an administrative, rather than legislative, capacity when it voted to ban the plaintiff's attendance, participation, and speech at future commission meetings.  *Id.* at 1252.  The

court reasoned that the board's actions did not serve a legislative function because they "did not concern the enactment or promulgation of public policy," but "were simply efforts to monitor and discipline [the plaintiff's] presence and conduct at future Commission meetings." *Id.*

The Tenth Circuit reached the opposite conclusion in *Sable v. Myers*, 563 F.3d 1120 (10th Cir. 2009), granting absolute legislative immunity to city council members for passing a resolution that authorized the city's use of eminent domain power to acquire the plaintiff's property. Distinguishing *Kamplain*, the court reasoned that the city's decision to use its eminent-domain authority to expand its public-works facility was legislative in nature because it was "an exercise of discretion regarding a matter of public policy that would impact the functioning of public services for years to come." *Sable*, 563 F.3d at 1126.

This case is more similar to *Kamplain* than it is to *Sable*. While plaintiff alleges that the city council defendants voted to authorize the filing of the attorney misconduct complaints, Docket No. 41 at 16-17, ¶ 71, their vote did not concern the "enactment or promulgation of public policy," *Kamplain*, 159 F.3d at 1252, but was a disciplinary measure taken in response to plaintiff's conduct in and relating to the CORA proceedings. Because the city council's action was administrative in nature, legislative immunity does not apply.

### c. Prosecutorial Immunity

Under the doctrine of prosecutorial immunity, government attorneys "are absolutely immune from civil liability for damages for acts undertaken . . . in preparing

for the initiation of judicial proceedings or for trial, and which occur in the course of [their] role as [advocates] for the State." *Stein*, 520 F.3d at 1193 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). While this doctrine was traditionally limited to the actions of government prosecutors in criminal proceedings, *see Mink v. Suthers*, 482 F.3d 1244, 1258 (10th Cir. 2007) (noting that, "[t]raditionally, the doctrine [of prosecutorial immunity] did not apply to other public officials" and was "limited to suits for malicious prosecution and defamation"), courts have extended it to "bar officials charged with the duties of investigating, drawing up, and presenting cases involving attorney discipline," *see, e.g.*, *Stein*, 520 F.3d at 1193 (internal quotation marks omitted) (citing *Clulow v. Oklahoma*, 700 F.2d 1291, 1298 (10th Cir. 1983)), and government defense attorneys involved in civil litigation. *See, e.g.*, *Benavidez v. Howard*, 931 F.3d 1225, 1231-32 (10th Cir. 2019) (holding that absolute immunity barred claims based on acts taken by government defense counsel in civil case). The "determinative factor is advocacy." *Mink*, 482 F.3d at 1261 (internal quotation marks omitted). Thus, "the more distant a function is from the judicial process, the less likely absolute immunity will attach." *Id.* (internal quotation marks omitted). The Tenth Circuit recently summarized "the rule of absolute immunity as applied to government attorneys" as follows:

> A government attorney's administrative duties and those investigatory functions that do not closely relate to an advocate's preparation for judicial proceedings are not entitled to absolute immunity. Rather, absolute immunity shields those acts undertaken by a government attorney in preparation for judicial proceedings *and* which occur in the course of his or her role as an advocate for the government.

*Benavidez*, 931 F.3d at 1231 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993),

and *Mink*, 482 F.3d at 1261).

Defendants assert absolute immunity in relation to: (1) the filing of the attorney misconduct complaints with the offices of attorney regulation; and (2) the filing of the contempt motion in the CORA proceedings. *See* Docket No. 49 at 7-10. The Court finds that prosecutorial immunity applies to the second act, but not the first.

As discussed above, defendants' argument with respect to the attorney misconduct complaints appears to rely exclusively on state-created immunity doctrines. *See* Docket No. 49 at 7-8. To the extent the argument could be read as implicating federally-recognized forms of absolute immunity, however, defendants have not cited any federal authority extending prosecutorial immunity to the filing of attorney misconduct complaints. Nor do federal cases support defendants' position. The Supreme Court has espoused the general principle that an official performing the function of a "complaining witness" is not entitled to prosecutorial immunity. *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997) (holding that a prosecutor was not entitled to absolute immunity for attesting to facts in support of a probable cause finding). In *McCormick v. Lawrence, Kansas*, 99 F. App'x 169 (10th Cir. 2004) (unpublished), the Tenth Circuit applied this principle to hold that an assistant attorney general was not entitled to prosecutorial immunity for filing a complaint with the state consumer protection division suggesting that the plaintiff be investigated for practicing law without a license. *Id.* at 172-74. Likewise, in *Lampton v. Diaz*, 639 F.3d 223 (5th Cir. 2011), the Fifth Circuit held that prosecutorial immunity did not extend to a prosecutor's "post-trial transfer of private federal tax records to a state ethics commission." *Id.* at 225.

After prosecuting a Mississippi Supreme Court justice for various criminal violations of which the justice was ultimately acquitted, the prosecutor in *Lampton* filed a complaint with the Mississippi Commission on Judicial Performance regarding the justice's conduct. *Id.* at 225. The prosecutor's complaint included copies of the justice's tax records, which were obtained during the earlier criminal investigation. *Id.* The supreme court justice and his wife subsequently filed a § 1983 lawsuit against the prosecutor, who moved to dismiss the case on the basis of prosecutorial immunity. *Id.* The Fifth Circuit affirmed the district court's denial of immunity, holding that the prosecutor's conduct in filing the ethics complaint appeared, on its face, "to be well outside the bounds of" common-law immunity protections because "[c]onduct undertaken after a federal prosecution is over is not part of the 'judicial phase,' and a state ethics proceeding is not part of 'the criminal process.'" *Id.* at 226. The court distinguished cases extending prosecutorial immunity to members of state ethics commissions on the ground that the prosecutor was not acting as a "member of the [state ethics commission]" or "a state ethics attorney authorized to prosecute cases before it." *Id.* at 227. Instead, the court reasoned, the prosecutor's "status was merely that of a complaining witness" who would not have been "accorded absolute immunity at common law." *Id.*

The logic of *McCormick* and *Lampton* applies equally to this case. While defendants allegedly filed formal actions with three state offices of attorney discipline concerning plaintiff's conduct in the CORA litigation, *see* Docket No. 41 at 16-17, ¶¶ 71-73, there are no allegations that any of the defendants were members of the state

offices or were state ethics attorneys tasked with prosecuting attorney misconduct complaints. *See Lampton*, 639 F.3d at 227. As the Tenth Circuit has stated, "[t]he relevant distinction for absolute immunity purposes is whether the official's actions are prosecutorial or testimonial; is the prosecutor acting as an advocate for the state or as fact witness?" *Thomas v. Kaven*, 765 F.3d 1183, 1192 (10th Cir. 2014) (citing *Kalina*, 522 U.S. at 129-30). Here, defendants' actions in filing the bar complaints were purely testimonial. Accordingly, prosecutorial immunity does not apply.

The cases defendants cite do not support a different conclusion. Although *Butz*, *Stein*, *Spear*, and *Shoutes* all addressed the issue of prosecutorial immunity, the defendants in those cases raised the defense in connection with traditional prosecutorial functions, such as the initiation of legal proceedings, which they were authorized to perform. *See Butz*, 438 U.S. at 515-16 (extending absolute immunity to agency officials' conduct initiating and presenting evidence in administrative proceedings); *Stein*, 520 F.3d at 1194 (holding that state disciplinary counsel was entitled to absolute immunity for deciding to bring an ethical complaint and failing to contact an adverse witness in advance of trial); *Spear*, 954 F.2d at 66 (holding that a local executive officer was entitled to absolute immunity for authorizing the initiation of legal proceedings); *Shoultes*, 886 F.2d at 118 (holding that city attorney was entitled to prosecutorial immunity for deciding to seek a contempt citation). The same is not true of defendants in this case.

Nor is the Court persuaded that Ms. Massey is entitled to prosecutorial immunity simply because she was professionally obligated to report unethical conduct to the state

bar associations. *See* Docket No. 49 at 5-6; Docket No. 58 at 9 n. 6. The Fifth Circuit in *Lampton* rejected an identical argument, explaining that the defendant's "ethical responsibilities did not make the transfer of tax records to a state commission part of his duty as a prosecutor." 639 F.3d at 228. The Court agrees with this reasoning. The availability of prosecutorial immunity depends on whether the actions at issue were sufficiently related to the judicial process. *See Thomas*, 765 F.3d at 1191. Whether Ms. Massey was independently obligated, by virtue of her bar license, to report plaintiff's unethical conduct is irrelevant. *Cf. id.* ("In determining whether particular acts of government officials are eligible for absolute immunity, we . . . look[] to the nature of the function performed, not the identity of the actor who performed it." (internal quotation marks omitted)).

Although the Court rejects defendants' prosecutorial immunity defense with respect to the attorney misconduct complaints, the Court agrees that Ms. Massey is immune from liability for her decision to file the contempt motion in the CORA litigation. Plaintiff argues that prosecutorial immunity does not apply because (1) "there is no special authorization for government attorneys to file contempt motions"; (2) "the filing of the contempt motion was not 'analogous' to a criminal prosecution"; and (3) "other courts have held that government defense attorneys . . . are not entitled to absolute immunity for actions performed in defending a government entity." Docket No. 54 at 9-10. However, these arguments are foreclosed by *Benavidez v. Howard*, 931 F.3d 1225 (10th Cir. 2019), in which the Tenth Circuit held that "a government defense attorney who, in the course of a civil adjudication, prepares a motion and arranges for the presentation of evidence on the court record by way of affidavit in support of the motion,

19

is absolutely immune from a collateral § 1983 suit for damages based on the filing of such motion and affidavit." *Id.* at 1232 (holding that city attorneys were immune from suit for the preparation and filing of a motion for a protective order in a civil case initiated by the plaintiff). To the extent plaintiff suggests that Ms. Massey may not avail herself of absolute immunity because her litigation conduct was guided by ulterior motives, *see* Docket No. 54 at 10 (arguing that Ms. Massey is not entitled to absolute immunity because "the contempt motion was an intentional attempt to silence [plaintiff]"), plaintiff misunderstands the nature of the absolute immunity defense, which applies regardless of a defendant's subjective intent. *See Imbler*, 424 U.S. at 427 (recognizing that the defense of prosecutorial immunity may "leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty"); *Milstein v. Cooley*, 257 F.3d 1004, 1008 (9th Cir. 2001) (stating that "[i]ntent should play no role" in the prosecutorial immunity analysis (internal quotation marks omitted)).

For the foregoing reasons, the Court finds that Ms. Massey is entitled to absolute immunity for the filing of the contempt motion. However, this holding is limited in two key respects. First, it does not apply to the city council defendants who, as discussed in more detail below, bear no apparent responsibility for the filing of the contempt motion. Second, the holding does not bar plaintiff's claims against the city, or Ms. Massey in her official capacity, because absolute immunity is a personal defense. *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) (stating that personal immunity defenses are unavailable in an official-capacity action, and that "[t]he only immunities

that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment"); *Mairena v. Foti*, 816 F.2d 1061, 1064 n.1 (5th Cir. 1987) ("[P]rosecutorial immunity is a personal defense, and is not applicable in this case since the district attorney is being sued in his official capacity only."); *Gearin v. Rabbett*, 2011 WL 317728, at *7 (D. Minn. Jan. 28, 2011) (discussing "substantial authority" supporting the "proposition that prosecutorial immunity does not extend to municipalities").

### 2. *Qualified Immunity and Failure to State a Claim*

Defendants argue that plaintiff has failed to allege a violation of her First and Fourteenth Amendment rights and that her individual capacity claims are barred by the doctrine of qualified immunity. *See* Docket No. 49 at 12-19.

When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A plaintiff may satisfy the clearly established prong by citing "a Supreme Court or Tenth Circuit decision on point" or by demonstrating that "the clearly established weight of authority from other courts . . . [has] found the law to be as the plaintiff maintains."

*Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (internal quotation marks omitted). While "[a] plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity," *id.*, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). In evaluating whether a plaintiff has met this burden, the Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Thus, the clearly established law "must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552.

### a. First Amendment – Content-Based Restriction

Plaintiff asserts two separate First Amendment claims. Her first claim for relief alleges that defendants' actions in filing the contempt motion and the formal grievances with the state offices of attorney discipline constituted a content- or viewpoint-based restriction on plaintiff's free speech rights. *See* Docket No. 41 at 20-21, ¶¶ 92-98. Plaintiff's second claim for relief asserts that defendants retaliated against her in violation of the First Amendment. *See id.* at 22-23, ¶¶ 108-111.

In their motion to dismiss, defendants apply a retaliation framework to both of plaintiff's First Amendment claims. *See* Docket No. 49 at 12. In addition to not challenging the application of that framework to her first claim for relief, plaintiff does not articulate a distinct legal theory supporting that claim. While plaintiff contends that

defendants' conduct constituted a "content-based restriction" on her speech, *see* Docket No. 54 at 15, she does not identify a court order that operated as a prior restraint on the exercise of her First Amendment rights, *see, e.g.*, N.Y. *Times Co. v. United States*, 403 U.S. 713, 714 (1971) (addressing the constitutionality of an injunction preventing the New York Times and the Washington Post from publishing the contents of a classified study), challenge a specific law, regulation, or policy restricting her ability to speak, *see, e.g.*, *Reed v. Town of Gilbert,* Ariz., 135 S. Ct. 2218, 2227-32 (2015) (holding that city ordinance regulating the display of outdoor signs violated the First Amendment); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 264-65 (1964) (holding that state libel laws violated the First and Fourteenth Amendments); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (characterizing issue as "whether a policy of compelling public employees to take a leave of absence if they want to run for public office is sufficiently important to the effective functioning of state (or, as here, city) government to justify the impairment of freedom of speech that may result"), or seek to use the First Amendment as a defense to tort liability. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 459-60 (2011) (holding that church was not subject to tort liability for protected speech under the First Amendment). Moreover, the cases plaintiff cites do not suggest that the type of conduct engaged in by defendants can constitute a "content-based restriction" on speech. *See, e.g.*, *Reed*, 135 S. Ct. at 2226-27 ("Government regulation of speech is content based if a *law* applies to particular speech because of the topic discussed or the idea or message expressed." (emphasis added)); *Scheffler v. Molin*, 743 F.3d 619, 621 & n.2 (8th Cir. 2014) (considering whether conduct by a city official constituted First

Amendment retaliation and declining to address whether the same conduct might amount to a "content-based restriction" on the plaintiff's "right of expression in a limited public forum"); *Garcia v. City of Trenton*, 348 F.3d 726, 727 (8th Cir. 2003) (considering whether conduct by city officials was retaliation in violation of the First Amendment). Last, plaintiff bases both of her First Amendment claims on the same underlying conduct. *Compare* Docket No. 54 at 15-16, *with*, *id.* at 17-18. Because plaintiff has failed to articulate a distinct and legally supported basis for her first claim for relief, that claim will be dismissed to the same extent as her retaliation claim. *See Valdez v. New Mexico*, 109 F. App'x 257, 263 n.4 (10th Cir. 2004) (unpublished) (concluding that the plaintiff had "not stated a First Amendment claim in any context" where the court could "discern no distinction" between the plaintiff's First Amendment retaliation claim and his claim alleging a direct denial of his First Amendment rights).

### b. First Amendment – Retaliation

To succeed on a First Amendment retaliation claim, plaintiff must show: (1) she "was engaged in constitutionally protected activity"; (2) defendants' "actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) defendants' "adverse action was substantially motivated as a response to [plaintiff's] exercise of constitutionally protected conduct." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007). Plaintiff asserts that defendants retaliated against her by: (1) filing the contempt motion in the CORA litigation; (2) making defamatory statements about her and her speech regarding the Air Quality Study; and (3) filing formal grievances with the state offices of attorney

discipline.  *See* Docket No. 54 at 17.

### i.  Filing of Contempt Motion

Because Ms. Massey is absolutely immune from liability for her decision to seek contempt sanctions against plaintiff in the underlying CORA proceedings, the only question is whether the filing of the contempt motion can support plaintiff's First Amendment claim against Colorado Springs and the city council defendants.

As indicated above, plaintiff does not specifically allege that any of the city council defendants were involved in the decision to seek contempt sanctions.  Although she asserts that "defendants" violated her rights by filing the motion for contempt, *see, e.g.*, Docket No. 41 at 3, 10-11, 21, ¶¶ 6, 42-43, 45, 97, general allegations that do not establish each individual defendant's personal involvement in the alleged constitutional violation are insufficient to confer liability under § 1983.  *See Pahls v. Thomas*, 718 F.3d 1210, 1231-33 (10th Cir. 2013) (holding that the district court erred by failing to conduct "a differentiated analysis" of each defendant's personal involvement in the alleged First Amendment violation); *Brown v. Montoya*, 662 F.3d 1152, 1164-66 (10th Cir. 2011) (holding that allegations referring generically to "Defendants" were insufficient to establish one defendant's personal participation in the alleged constitutional violation); *see also id.* at 1165 ("The need for individualized allegations is especially important where . . . each of the defendants had different powers and duties, but the Complaint fails to identify specific actions taken by particular defendants that could form the basis of a constitutional violation." (internal quotation marks omitted)).  Because plaintiff's allegations do not establish that any of the city council defendants

were personally involved in the decision to file the contempt motion, those defendants are entitled to qualified immunity as to that aspect of plaintiff's free speech and retaliation claims.

The Court also finds that plaintiff has failed to state a municipal liability claim based on the filing of the contempt motion.[2]  In a § 1983 suit, "municipalities cannot be held liable for the actions of others under the common law principle of *respondeat superior*; they are responsible only for their *own* actions."  *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007).  Thus, to establish a municipal liability claim, a plaintiff must show a "municipal policy or custom" having a "direct causal link" to the asserted constitutional violation.  *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2019) (internal quotation marks omitted).  Such a policy or custom can take one of several forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* at 1283 (internal quotation marks omitted).

---

[2]Plaintiff incorrectly characterizes the survivability of her municipal liability claim as an issue of qualified immunity.  *See* Docket No. 54 at 21-22.  Because municipalities are not entitled to qualified immunity, *see Pyle v. Woods*, 874 F.3d 1257, 1264 (10th Cir. 2017) ("Qualified immunity is not available as a defense to municipal liability." (citing *Owen v. City of Independence, Mo.*, 445 U.S. 622, 637-38 (1980))), the relevant question is whether plaintiff has established the elements of a municipal liability claim.

In response to defendants' motion to dismiss her municipal liability claims, plaintiff argues that "the decision to file bar complaints against [plaintiff] was a decision made by, and ratified by, the City Council, Colorado Springs' official policymakers," Docket No. 54 at 21-22, thereby predicating municipal liability for the attorney misconduct complaints on the policymaker and ratification theories identified above.  In contrast, plaintiff does not identify any policy or custom leading to the filing of the contempt motion.  Although the complaint refers generally to the motion filed by "Colorado Springs," Docket No. 41 at 3, 10-11, ¶¶ 6, 42-45, it does not allege that Ms. Massey filed the motion pursuant to a municipal policy or custom, that Ms. Massey was acting as a final policymaker for Colorado Springs, or that some other municipal policymaker directed or ratified Ms. Massey's decision.[3]  Because plaintiff has not demonstrated any basis on which to hold Colorado Springs liable for the filing of the contempt motion, defendants are entitled to dismissal of that aspect of her First Amendment claims.  *See Webb v. Town of Saint Joseph*, 925 F.3d 209, 216-19 (5th Cir. 2019) (affirming summary judgment on a municipal liability claim where the plaintiffs failed to show that the town attorney was acting as a final policymaker in the litigation proceedings or that the mayor had, himself, directed or ratified a violation of the plaintiffs' constitutional rights); *Red Zone 12 LLC v. City of Columbus*, 758 F. App'x 508, 516-17 (6th Cir. 2019) (unpublished) (affirming dismissal of municipal liability claim

---

[3]Plaintiff's conclusory allegations that (1) "it is the custom, practice and policy of Colorado Spring [sic] to deny Plaintiff the right to speak out on matters of public concern," Docket No. 41 at 21-22, ¶ 100, and (2) defendants acted "pursuant to the customs, policies, and practices of Defendant Colorado Springs," *id.* at 22, ¶ 102, are insufficient.

where plaintiff failed to allege facts showing that the city attorney acted as an official municipal policymaker or pursuant to city policy in filing nuisance abatement action); *Sandberg v. Englewood, Colo.*, 727 F. App'x 950, 964 (10th Cir. 2018) (unpublished) (affirming dismissal of municipal liability claim where complaint failed to plausibly allege that the city attorney was a policymaker for the city police department).[4]

### ii. Defamatory Statements by City Officials

To the extent plaintiff asserts that defamatory statements by city officials constituted retaliatory conduct in violation of the First Amendment, *see* Docket No. 54 at 17; *see also* Docket No. 41 at 12-16, 19-20, ¶¶ 48-67, 87-88, this aspect of her claim fails on the second element.

Whether defendants' conduct caused plaintiff an injury that would chill a person of ordinary firmness from continuing to engage in protected First Amendment activity is an objective standard. *See Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004). This standard "permits a plaintiff who perseveres despite governmental interference to bring suit," but precludes claims based on "a trivial or de minimis injury." *Id.* at 954-55 (internal quotation marks omitted).

Here, plaintiff asserts a reputational injury stemming from public statements by

---

[4]Based on this holding, plaintiff's official-capacity claims against Ms. Massey for the filing of the contempt motion will also be dismissed. *See Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("Suing individual defendants in their official capacities under § 1983 . . . is essentially another way of pleading an action against the county or municipality they represent."); *Rose v. City & Cty. of Denver*, No. 17-cv-02263-MSK-STV, 2018 WL 1744723, at *2 (D. Colo. Apr. 11, 2018) (analyzing "municipal and official-capacity claims together" on a motion to dismiss "because official-capacity suits are treated as suits against the entity in all respects other than name" (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))).

various city officials that plaintiff's claims about the Air Quality Study were "not true," Docket No. 41 at 12-13, ¶¶ 49-52, that she "may have violated" the Colorado Court of Appeals order by talking publicly about the Air Quality Study, *id.* at 15, ¶ 62, that she knew her actions were "illegal," *id.* at 14, ¶¶ 56-57, and that she had acted unethically. *Id.* at 19, ¶ 87; *see* Docket No. 54 at 17 (arguing that "defamatory statements that cause a person to lose professional standing, and job opportunities, constitute action that would chill a person of ordinary firmness from continuing to speak"). As the Tenth Circuit has stated, however, "injury to one's reputation is not enough to defeat constitutional interests in furthering uninhibited, robust debate on public issues." *Eaton*, 379 F.3d at 956 (quoting *Phelan v. Laramie Cty. Cmty. College Bd. of Trustees*, 235 F.3d 1243, 1248 (10th Cir. 2000)). Applying the "vigorous" standard for evaluating objective chill, *Valdez v. New Mexico*, 109 F. App'x 257, 263 (10th Cir. 2004) (unpublished), courts in this circuit have found statements concerning the illegality or impropriety of a plaintiff's conduct insufficient, standing alone, to support a First Amendment retaliation claim. *See, e.g.*, *How v. City of Baxter Springs, Kan.*, 217 F. App'x 787, 798 (10th Cir. 2007) (unpublished) (city attorney's statements to newspaper that he had found a special prosecutor willing to re-file criminal charges against the plaintiff did not cause the plaintiff an injury that would have "chill[ed] a person of ordinary firmness from continuing to exercise his constitutional rights"); *Valdez*, 109 F. App'x at 263 (statements made to the press regarding the plaintiff's possible involvement in criminal activity did not satisfy the "chill" element of a First Amendment claim); *Taylor v. City of Claremore*, 2019 WL 3482965, at *9 (N.D. Okla. July 31, 2019)

(statement that the plaintiff had "committed perjury" would not have chilled a person of ordinary firmness from continuing to engage in First Amendment activity); *see also Phelan*, 235 F.3d at 1248 (holding that a statement by a board of trustees censuring the plaintiff for a violation of ethics policy did not infringe on the plaintiff's free speech rights because the plaintiff "remained free to express her views publicly and to criticize the ethics policy and the Board's censure")

The Tenth Circuit's decision in *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), is not inconsistent. In that case, an investigator asserted a First Amendment retaliation claim against a law enforcement officer who allegedly threatened the plaintiff's prospective employer – the district attorney – that the officer's agency would withdraw its support for the district attorney's fledgling drug task force if the plaintiff were hired. *See id.* at 1200, 1202-03, 1213. The Tenth Circuit held that the plaintiff had satisfied the second element of his retaliation claim because there was evidence showing that the defendant had "caused the withdrawal of [the plaintiff's] job offer by refusing to cooperate with the [district attorney's] fledgling task force," and the defendant's "statements that [the plaintiff] was not trusted by a significant section of the law enforcement community could adversely affect [the plaintiff's] ability to obtain other positions." *Id.* at 1213. Although *Worrell* supports the idea that statements having an adverse effect on an individual's employment prospects may, under some circumstances, be sufficient to demonstrate objective chill, the defendant in *Worrell* did not simply make disparaging comments about the plaintiff – he directly caused the withdrawal of the plaintiff's job offer by threatening to withhold resources from the

district attorney if the plaintiff was hired.  *See* 219 F.3d at 1213.  While plaintiff in this case alleges that she lost out on one "professional client opportunity," Docket No. 41 at 20, ¶ 88, there are no allegations that defendants directly interfered with her client relationships.  Moreover, the complaint does not establish that the loss of the client opportunity was the result of the alleged defamatory statements as opposed to the filing of the contempt motion or the bar complaints.  *See id.* (stating only that she "lost at least one professional client opportunity because of Defendants' false statements"); *see also Glover v. Mabrey*, 384 F. App'x 763, 770 (10th Cir. 2010) (unpublished) ("Merely encouraging or engaging in action is not an actionable constitutional violation unless it results in some harm to the plaintiff."); *McBeth v. Himes*, 598 F.3d 708, 718-20 (10th Cir. 2010) (holding that the plaintiff had failed to establish the second element of her retaliation claim because she had not shown that the defendant's retaliatory conduct was the but-for cause of her injury).

Because plaintiff has failed to allege that defendants' alleged defamatory statements caused an injury that would have chilled a person of ordinary firmness from continuing to engage in protected First Amendment activity, *see Eaton*, 379 F.3d at 956 (stating that the "objective standard of a person of ordinary firmness . . . is substantial enough that not all insults in public debate become actionable under the Constitution"), this aspect of plaintiff's First Amendment claims will be dismissed.

### iii.  Filing of Formal Grievances

Plaintiff asserts a First Amendment retaliation claim based on defendants' filing of formal grievances with the state offices of attorney discipline.  *See* Docket No. 54 at

17; Docket No. 41 at 23, ¶¶ 109, 111.  The Court finds that plaintiff has alleged

sufficient facts to support this aspect of her First Amendment retaliation claim.

First, the complaint establishes that plaintiff engaged in protected First

Amendment activity when she spoke to the news media about the city's improper

withholding of records concerning air quality.  *See* Docket No. 41 at 9-10, ¶¶ 39-41;

*Lane v. Franks*, 573 U.S. 228, 235-36 (2014) ("Speech by citizens on matters of public

concern lies as the heart of the First Amendment, which was fashioned to assure

unfettered interchange of ideas for the bringing about of political and social changes

desired by the people."); *Shero*, 510 F.3d at 1203 (stating that the plaintiff "was

engaged in constitutionally protected activity when he alleged government corruption

during the public comments portion of the city council meetings").[5]

Although defendants do not dispute that this type of activity generally qualifies for

First Amendment protection, they contend that plaintiff's speech was not protected in

this case because it concerned the contents of a privileged report.  *See* Docket No. 49

at 12-13.  On November 16, 2016, plaintiff filed a notice with the Colorado Court of

Appeals stating that she had received an electronic disk from the court containing a file

labeled "Sealed," and requesting the court's guidance as to whether the file had

_____

[5]Plaintiff did not lose her entitlement to First Amendment protections merely
because she was an attorney speaking about issues pending before the Colorado
Court of Appeals.  *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1054 (1991)
(plurality op.) ("[N]one of the justifications put forward by respondent suffice to sanction
abandonment of our normal First Amendment principles in the case of speech by an
attorney regarding pending cases."); *id.* at 1081-82 (O'Connor, J., concurring) ("Lawyers
are officers of the court and, as such, may legitimately be subject to ethical precepts
that keep them from engaging in what otherwise might be constitutionally protected
speech.  This does not mean, of course, that lawyers forfeit their First Amendment
rights, only that a less demanding standard applies.").

inadvertently been disclosed.  Docket No. 49-1 at 2; *see also* Docket No. 41 at 8-9,

¶¶ 33, 36.  On the same day, the Colorado Court of Appeals entered an order clarifying

that the file had been disseminated due to a clerical error and directing the parties not

to "download[ ], cop[y], otherwise retain[ ], or disseminate[ ]" the file "without further

order of the Court."  Docket No. 49-2 at 2; *see also* Docket No. 41 at 9, ¶ 37.[6]  The

court cautioned that any "distribution of the sealed material [would] be a violation of

Court Orders and subject to further appropriate action."  Docket No. 49-2 at 2.  On

November 21, 2016, plaintiff filed a "Motion for Immediate Access to Certain Withheld

Records," in which she discussed the contents of the Air Quality Study and requested

"immediate access to certain records in the sealed file."  Docket No. 49-3 at 1-2.

Plaintiff alleges that she shared "the first two motions she filed with the Colorado Court

of Appeals with a reporter with the Colorado Springs Gazette, and others, via email."

Docket No. 41 at 9, ¶ 39.

The Court assumes, without deciding, that the knowing disclosure of privileged

records in violation of a court order does not constitute protected activity under the First

Amendment.  *Cf. Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984) ("A litigant has

no First Amendment right of access to information made available only for purposes of

trying his suit."); *Am. Motors Corp. v. Huffstutler*, 575 N.E.2d 116, 120 (Ohio 1991)

(relying on *Seattle Times Co.* for the proposition that "[d]isclosure of confidential

information does not qualify for protection against prior restraint under the First

Amendment").  However, plaintiff asserts that she "did not disclose any portion of the

---

[6]Plaintiff's allegation that the Colorado Court of Appeals entered its order on November 16, 2017, *see* Docket No. 41 at 9, ¶ 37, appears to be a typographical error.

Study in violation of any law or ethical rule," but merely "spoke publicly about her impressions of the Study." Docket No. 54 at 14. To the extent plaintiff claims that the Colorado Court of Appeals' November 16, 2016 order did not prohibit her from "discuss[ing] the sealed material," Docket No. 41 at 9, ¶ 37, she is drawing a legal conclusion that is unsupported by the plain language of November 16, 2016 order. The clear import of the court's directive not to "disseminate[ ]" the file was that the parties were prohibited from discussing the contents of the file, including the Air Quality Study. *See* Docket No. 49-2 at 2.

Plaintiff also alleges, however, that the Colorado Court of Appeals "confirmed" she was not legally barred from "sharing her publicly filed motions or speaking about the contents of the documents that had been inadvertently disclosed to her." Docket No. 41 at 9, ¶ 38. She states that she was never found to be in violation of any law or court order, *id.* at 11, ¶ 47, and that all three bar complaints filed against her were dismissed after it was determined that she had not engaged in unethical conduct. *Id.* at 19, ¶¶ 86-87.[7] These allegations give rise to a reasonable inference that plaintiff did not violate the Colorado Court of Appeals' orders by discussing the contents of the Air Quality Study.

Defendants argue in their reply brief that plaintiff's allegations should not be credited because (1) plaintiff acknowledged in her November 21, 2016 motion that the Court of Appeals had not addressed whether information from the privileged report

---

[7]Plaintiff's allegation that she never violated any law or rule of professional conduct is a legal conclusion and will therefore be disregarded. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

could be used in the "present action or otherwise"; and (2) "[t]he fact that she did *not* have permission to disclose the report's contents is the only way to explain why the Court of Appeals moved forward with the City's request to find her in contempt." Docket No. 58 at 4-5.[8]  Both of these arguments require the Court to draw inferences from evidence outside of the pleadings.  Although the Court agrees that it may consider the filings and court orders in the underlying CORA litigation, those documents do not conclusively rebut plaintiff's allegations that she received permission from the Colorado Court of Appeals to disseminate her November 21 motion and did not violate any ethics rule or court order.  As a result, the Court finds it appropriate to defer resolution of defendants' arguments to the summary judgment stage.

The next issue is whether plaintiff has plausibly alleged an injury that would chill a person of ordinary firmness from continuing to engage in protected activity.  *See Shero*, 510 F.3d at 1203.  Plaintiff asserts that she suffered reputational harm and the "loss of at least one client opportunity" as a result of defendants' "false statements." Docket No. 41 at 20, ¶¶ 88; *see also* Docket No. 54 at 17.  As discussed above, however, reputational injury is generally insufficient, by itself, to satisfy the second element of a First Amendment retaliation claim, *see Eaton*, 379 F.3d at 956, and plaintiff's allegation that she "lost at least one professional client opportunity because of

_____

[8]Defendants also argue that plaintiff's November 21, 2016 motion makes "abundantly clear that she did, in fact, disclose the contents of the privileged report in direct violation of the November 16 Order."  Docket No. 58 at 5.  However, assuming that plaintiff received permission from the Colorado Court of Appeals to share her motions and discuss the contents of the privileged documents, Docket No. 41 at 9, ¶ 38, the November 21 motion would not, by itself, demonstrate that she violated an ethics rule or court order.  *See* Docket No. 49-2 at 1-2 (ordering that record not be "disseminated . . . *without further order of the Court*" (emphasis added)).

Defendants' false statements" does not make clear that the loss was specifically attributable to the filing of the formal grievances. *See Glover*, 384 F. App'x at 770. On the other hand, plaintiff alleges that she "was forced to obtain counsel in multiple states to defend against the false and defamatory statements made in the formal actions against [her] professional licensures." Docket No. 41 at 19, ¶ 85. The Court finds that the time and expense required to defend against bar complaints in three separate states would be enough to chill a person of ordinary firmness from engaging in protected First Amendment activity. *Cf. Glover*, 384 F. App'x at 771 (assuming, without deciding, that the "cost and time spent complying with an [IRS] audit could satisfy the injury-in-fact requirement" for purposes of a First Amendment retaliation claim); *Christopherson v. Poutsch*, 2015 WL 13662707, at *19 (D.N.M. Apr. 30, 2015) (holding that the defendant's actions in filing an ethics complaint against the plaintiff and asking the Public Education Department to revoke her licenses "would chill a person of ordinary firmness from continuing to exercise her free speech rights"). Accordingly, plaintiff has sufficiently alleged the second element of her retaliation claim.

Plaintiff has also shown that the defendants' actions were " substantially motivated as a response to [plaintiff's] exercise of constitutionally protected conduct." *Shero*, 510 F.3d at 1203. Although the four-month lapse between the alleged protected activity and defendants' actions regarding the formal grievances precludes plaintiff from relying solely on temporal proximity to satisfy the third element, *see* Docket No. 41 at 8-10, 16-17, ¶¶ 33-40, 71-72; *cf. Lamb v. Montrose Cty. Sheriff's Office*, 16-cv-03056-RM-GPG, 2019 WL 2866646, at *4 (D. Colo. July 3, 2019) ("Under Tenth Circuit precedent,

temporal proximity alone is insufficient to establish causation if the retaliatory action occurs more than three months after protected activity." (citing *Lauck v. Campbell Cty.*, 627 F.3d 805, 815 (10th Cir. 2010), plaintiff has also alleged that the grievances contained "false and misrepresentational statements about [plaintiff] including that [she] had violated one or more court orders, was not prompt in informing the court, and that [she] had unlawfully disclosed government records." Docket No. 41 at 17, ¶ 72. This allegation adequately establishes the third element of plaintiffs' retaliation claim. *See Flores v. Victory Preparatory Acad.*, No. 18-cv-02916-RM-SKC, 2019 WL 4059157, at *6 (D. Colo. Aug. 28, 2019) (finding the third element of the plaintiffs' First Amendment retaliation claim satisfied where the plaintiffs alleged that the letter informing them they were being banned from the school campus referenced the plaintiffs' speech).[9]

Because the individual defendants assert a qualified immunity defense, the next step is to determine whether plaintiff had a clearly established right to be free from the retaliatory filing of bar complaints. *See Matson v. Hrabe*, 612 F. App'x 926, 930 (10th Cir. 2015) (unpublished) (stating that the plaintiff's "right" for purposes of the qualified immunity analysis was "not the right to be free from retaliation for filing grievances, but the more specific right to be free from a retaliatory transfer to another general-

_____

[9]As indicated in defendants' motion, *see* Docket No. 49 at 14, plaintiff's ability to succeed on this element of her retaliation claim after the motion-to-dismiss stage will depend largely on whether her comments about the Air Quality Study constituted protected speech. *See* Docket No. 49 at 14; *Hawver v. Nuss*, 2015 WL 1034375, at *4 (D. Kan. Mar. 10, 2015) (finding allegation that "the State Disciplinary Proceeding Defendants pursuit of disciplinary charges against [the plaintiff] was substantially motivated by his exercise of his First Amendment rights [was] completely implausible," where it was clear from the "Kansas Board for Discipline of Attorneys' report and Plaintiff's own affidavit" that the plaintiff had "violated numerous ethical rules").

population unit in the same prison that has less favorable living conditions"). The Court

has not found any binding case law that would have placed defendants on notice that

the filing of the formal grievances "would be considered sufficiently chilling to establish

a constitutional violation." *Matson*, 612 F. App'x at 930.[10]  Defendants are therefore

entitled to qualified immunity with respect to plaintiff's First Amendment, individual-

capacity claims.

　　Plaintiff also asserts claims for municipal liability, to which defendants' qualified

immunity defense does not apply. *Pyle v. Woods*, 874 F.3d 1257, 1264 (10th Cir.

2017).  As discussed above, allegations are sufficient to establish a municipal liability

claim if they show a "municipal policy or custom" having a "direct causal link" to the

asserted constitutional violation. *Waller*, 932 F.3d at 1283-84 (internal quotation marks

omitted).  Here, plaintiff alleges that "the Colorado Springs City Council voted to take

formal action against Ms. Weise in all states that she holds professional licensure,"

which resulted in the city attorney's filing of formal actions against plaintiff in those

---

[10]Neither *Glover* nor *Christopherson* constitutes clearly established law in this area. *Glover* assumed, without deciding, that "the cost and time spent complying with an [IRS] audit could satisfy" the injury requirement for a retaliation claim, 384 F. App'x at 771, and a single district court decision is insufficient to overcome a qualified immunity defense. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("[D]istrict court decisions – unlike those from the courts of appeals – do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity."). Moreover, there are Tenth Circuit decisions that appear to support a finding that the filing of a bar complaint is not enough to chill a person of ordinary firmness from engaging in protected First Amendment activity. *See, e.g.*, *Eaton*, 379 F.3d at 956 (holding that a sheriff's single action in running a background check on the plaintiffs "was not enough to chill the actions of persons of ordinary firmness who enter the arena of political debate to sponsor a recall petition against a sheriff who they accuse of abusing his office"); *Phelan*, 235 F.3d at 1248 (holding that being censured for violating a board of trustees' ethics policy did not infringe the plaintiff's First Amendment rights).

states. Docket No. 41 at 16-17, ¶¶ 71-72. Plaintiff further states that the "Colorado Springs City Council is the final policymaker for Colorado Springs." *Id.* at 18, ¶ 80. The Court finds these allegations sufficient to demonstrate a municipal policy having a direct causal link to the alleged constitutional violation. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("No one has ever doubted . . . that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body – whether or not that body had taken similar action in the past or intended to do so in the future – because even a single decision by such a body unquestionably constitutes an act of official government policy."); *Waller*, 932 F.3d at 1283 (stating that a municipal policy or custom may take the form of a decision by employees with final policy-making authority, or "the ratification by such final policymakers of the decisions . . . of subordinates to whom authority was delegated").[11]

### 3. Fourteenth Amendment Claims

Plaintiff asserts that defendants violated her due process rights under the Fourteenth Amendment by making defamatory statements that jeopardized her employment. Docket No. 41 at 26-27, ¶¶ 140-49. Although not clear from the complaint, plaintiff appears to base this claim on the (1) the individual defendants' public statements concerning plaintiff and her comments on the Air Quality Study; and (2) defendants' actions in filing the formal grievances with the state offices of attorney discipline. *See id.* at 12-17, ¶¶ 49-52, 56-57, 71-72; Docket No. 49 at 16 (construing claim as being based on the filing of the formal grievances, the request for contempt

---

[11]Defendants do not assert that the city council lacked policy-making authority. *See* Docket No. 58 at 8-9.

sanctions, defendants' statements that plaintiff's assertions were "not true," and defendants' statements that plaintiff may have violated the November 16 order); Docket No. 54 at 13 n.12 (stating that plaintiff's "Fourteenth Amendment claim and state-law defamation claims are not premised on the filing of the contempt motion, but rather on the filing of the frivolous and retaliatory bar complaints and the defamatory statements made to the public by a number of Colorado Springs officials").

A claim that the government has violated an individual's due process rights by damaging her reputation must satisfy the "stigma-plus" standard. *See Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1184 (10th Cir. 2016) (internal quotation marks omitted). Under that standard, a plaintiff must show: "(1) governmental defamation and (2) an alteration in legal status." *Id.* (internal quotation marks omitted). When both elements are present, "the government may have violated a liberty interest that triggers a procedural due process protection" under the Fourteenth Amendment. *Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012) (internal quotation marks and bracket omitted). "Damage to reputation alone, however, is not sufficient." *Martin Marietta Materials, Inc.*, 810 F.3d at 1184.

Defendants argue that plaintiff cannot satisfy the elements of her stigma-plus claim because she has not alleged governmental defamation or an alteration in legal status. Docket No. 49 at 16-17. Because plaintiff's claim fails on the second element, the Court need not decide whether the allegations establish governmental defamation.

Plaintiff contends that defendants' conduct caused an alteration in legal status in two ways: (1) by "chang[ing]" her bar license from being in "good standing clear of any

complaints, to under investigation"; and (2) by depriving plaintiff of specific employment opportunities.  Docket No. 54 at 20.  As a matter of law, neither of these allegations satisfies the stigma-plus standard.

The Tenth Circuit has held that being under investigation for professional misconduct does not constitute an alteration in legal status.  *See Setliff v. Memorial Hospital of Sheridan Cty.,* 850 F.2d 1384, 1396 (10th Cir. 1988).  In *Setliff*, the Tenth Circuit rejected a claim that an investigation into the plaintiff's medical practice deprived him of a liberty interest without due process by "effectively destroy[ing] his ability to pursue his profession."  *Id.* at 1394.  The Court reasoned that, although "due process protects [an] individual's freedom to earn a living," the plaintiff's "employment status was never altered during the investigation," his "medical staff privileges were not modified or restricted," and his "allegation that the investigation caused him to be less attractive to other employers, and perhaps to patients, without more, [was] insufficient to establish the existence of a liberty interest."  *Id.* at 1396.  As in *Setliff*, plaintiff has not alleged that the investigations conducted by the state disciplinary offices restricted her ability to practice law.  To the contrary, all three state bar complaints were dismissed in her favor based on a finding that she had not committed any ethical violations.  See Docket No. 41 at 19, ¶¶ 85-87.  Accordingly, the fact that her license may have been under investigation does not constitute an alteration in legal status for purposes of her stigma-plus claim.  *See Setliff*, 850 F.2d at 1397; *cf. Fortner v. Cty. of El Paso*, No. 15-cv-0644-WJM-NYW, 2016 WL 806751, at *5 (D. Colo. Mar. 2, 2016) (stating that "[a]voiding an investigation is not a protected property or liberty interest").

Plaintiff's allegation that she lost "one professional client opportunity" as a result

of defendants' defamatory conduct is also insufficient.  Docket No. 54 at 20; *see also* Docket No. 41 at 20, ¶ 88.  As the Tenth Circuit has stated, "neither reputational harm nor resulting impairment of future employment opportunities are actionable" under the Fourteenth Amendment.  *Williams v. United States*, 2019 WL 4051951, at *5 (10th Cir. Aug. 28, 2019) (internal quotation marks omitted) (allegations that the plaintiff had experienced "lost standing," "damage to his good name and reputation," and "lost employment from several potential employers" was insufficient to demonstrate an alteration in legal status); *see also Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (rejecting stigma-plus claim based on damage to future employment prospects); *Phelps v. Wichita* Eagle-Beacon, 886 F.2d 1262, 1269 (10th Cir. 1989) (stating that damage to the plaintiff's prospective employment opportunities was "too intangible" to constitute a deprivation of a liberty or property interest under § 1983, absent a showing that the plaintiff's "status as a lawyer and his existing legal rights [were] significantly altered"); *Setliff*, 850 F.2d at 1396 (stating that "circumstances which make an employee somewhat less attractive to employers" does not "establish the kind of foreclosure of opportunities amounting to a deprivation of liberty" (internal quotation marks omitted)).[12] As the Supreme Court explained in *Siegert*,

> Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation.  But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not

---

[12]Some courts have noted Tenth Circuit case law suggesting "there may be a liberty interest injury without a termination, if other employment opportunities are alleged to be 'foreclosed,' not just made more difficult to obtain because of reputational damage."  *Hale v. Emporia State Univ.*, 2016 WL 141655, at *3 (D. Kan. Jan. 12, 2016).

recoverable in a *Bivens* action.

500 U.S. at 234. Because plaintiff's loss of "one professional client opportunity" "flow[ed] from" her alleged reputational harm, it is not actionable under the Fourteenth Amendment. *See Williams*, 2019 WL 4051951, at *5. Plaintiff's stigma-plus claim will therefore be dismissed.

### B. State-Law Claims

In addition to her federal constitutional claims, plaintiff asserts claims against the individual defendants for defamation, intentional infliction of emotional distress, and abuse of process under Colorado law. *See* Docket No. 41 at 24-28, ¶¶ 117-39, 150-55. Defendants move for dismissal of the claims on the basis that: (1) they are barred by the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. §§ 24-10-101 *et seq.*; (2) the claims against Ms. Massey are barred by absolute immunity; and (3) the allegations do not support an abuse of process claim. *See* Docket No. 49 at 19-23.

Given the parties' agreement that the CGIA applies to plaintiff's state-law claims, *see* Docket No. 54 at 24 (arguing only that defendants' conduct was "willful and wanton"), the Court considers, *sua sponte*, whether plaintiff has complied with the notice requirements of the CGIA. *See Aspen Orthopaedics & Sports Medicine, LLC v. Aspen Valley Hosp. Dist.*, 353 F.3d 832, 838 (10th Cir. 2003) (considering, *sua sponte* on interlocutory appeal, whether the plaintiffs "complied with the CGIA notice provisions"); *Ryberg ex rel. Estate of Ryberg v. City and Cty. of Denver*, No. 13-cv-02333-CMA-KLM, 2014 WL 4068642, at *10 (D. Colo. Apr. 29, 2014) (considering, sua sponte, whether the plaintiff complied with the CGIA's notice requirements, citing

*Aspen*), *report and recommendation rejected in part on other grounds*, 2014 WL

4067170 (D. Colo. Aug. 13, 2014); *City & Cty. of Denver v. Crandall*, 161 P.3d 627, 634

(Colo. 2007) (stating that the "CGIA notice of claim provision is both a condition

precedent and a jurisdictional prerequisite to suit").

"The notice provisions of the CGIA apply when federal courts hear Colorado tort

claims under supplemental jurisdiction." *Aspen Orthopaedics & Sports Medicine, LLC*,

353 F.3d at 838. Under subsection one,

> Any person claiming to have suffered an injury by a public entity or by an
> employee thereof while in the course of such employment, whether or not
> by a willful and wanton act or omission, shall file a written notice as
> provided in this section within one hundred eighty-two days after the date
> of the discovery of the injury, regardless of whether the person then knew
> all of the elements of a claim or of a cause of action for such injury.
> Compliance with the provisions of this section shall be a jurisdictional
> prerequisite to any action brought under the provisions of this article, and
> failure of compliance shall forever bar any such action.

Colo. Rev. Stat. § 24-10-109(1). Colorado courts have "consistently [held] that

complying with the notice of claim as set forth in section 24-10-109(1) is a jurisdictional

prerequisite to suit." *Aspen Orthopaedics & Sports Med., LLC*, 353 F.3d at 839

(internal quotation marks and brackets omitted); *see also, e.g.*, *City & Cty. of Denver*,

161 P.3d at 634; *Finnie v. Jefferson Cty. Sch. Dist. R-1*, 79 P.3d 1253, 1256 (Colo.

2003) (stating that the court has interpreted Colo. Rev. Stat. § 24-10-109(1) as a

"jurisdictional prerequisite to suit" requiring "strict compliance with its terms"). The

Tenth Circuit has further concluded that, "[i]n the context of a motion to dismiss,

pleading compliance with the notice provisions of the CGIA is *de facto* jurisdictional."

*Aspen Orthopaedics & Sports Med., LLC*, 353 F.3d at 840. In other words, "[w]hen a

plaintiff fails to plead compliance with the CGIA, and a court addresses the case in the context of a motion to dismiss, the court must accept as a matter of 'fact' that the plaintiff failed to comply with the notice provisions." *Id.*

In this case, plaintiff's complaint does not include any allegations that she complied with the notice provisions of the CGIA. She has therefore failed to demonstrate that the Court has jurisdiction over her state-law claims. Because it is not clear from the record that plaintiff will be unable to cure this pleading deficiency by amendment, plaintiff's state-law claims will be dismissed without prejudice. *See Aspen Orthopaedics & Sports Med., LLC*, 353 F.3d at 842; *Vreeland v. Fisher*, No. 13-cv-02422-PAB-KMT, 2014 WL 4854739, at *8 (D. Colo. Sept. 29, 2014).

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED that defendants' Motion to Dismiss [Docket No. 49] is **GRANTED** in part and **DENIED** in part, as stated in this order. It is further

ORDERED that plaintiff's first and second claims for relief are **DISMISSED** with prejudice to the extent they assert claims (1) against defendants in their individual capacities, and (2) against Colorado Springs based on the filing of the contempt motion and alleged defamatory statements by city officials. It is further

ORDERED that plaintiff's seventh claim for relief is **DISMISSED** with prejudice. It is further

ORDERED that plaintiff's third, fourth, fifth, sixth, and eighth claims for relief are **DISMISSED** without prejudice for lack of subject matter jurisdiction.

DATED September 30, 2019.

BY THE COURT:


  s/Philip A. Brimmer                        
PHILIP A. BRIMMER
Chief United States District Judge